# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        **Plaintiff,**

v.                                  **Criminal Action No.: 1:15CR108**

ANTONIO COTTINGHAM,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter before the Court is pursuant to Defendant Antonio Cottingham's "Motion to Suppress" filed on December 14, 2015 (Doc. No. 23). District Court Judge Irene M. Keeley later referred the pending motion to the undersigned for a Report and Recommendation (Doc. No. 24). The United States ("Government") filed its response to Defendant's motion on December 22, 2015 (Doc. No. 27). A hearing on this matter was held before the undersigned on January 6, 2015 (Doc. No. 30).

## I. Factual Background

The following is derived from the Fairmont police officers' testimony [Doc. No. 30] and their subsequent police reports admitted into evidence as Joint Exhibit 1 (Doc. No. 31).

## A. Initial 911 Call

On August 23, 2015, at approximately 12:04am, the Fairmont Police Department received an emergency call in reference to a suspicious person located at 348 Satterfield Street (Joint Ex. 1 at 3, 6, 7). Three Fairmont police officers were dispatched to the scene: (1) Officer Tyler S. Hall; (2) Officer Kenneth L. Carder, Jr.; and (3) Officer Cameron Golden. Id. Officer Golden spoke with the complainant who stated that he "had seen a black male wearing blue jeans

and a black hoodie" near his house but had ran to Blaine Street when confronted. (Joint Ex. 1 at 7). The officers then proceeded to search the area for the unknown individual (Joint Ex. 1 at 3, 6, 7).

While searching the area, Officer Hall was stopped by a Caucasian female who informed him that "a suspicious car had been parked in front of her neighbors house for while before a black male with a hood sweatshirt got in and drove away" (Joint Ex. 1 at 3). The witness then provided Officer Hall the vehicle's make, model, and registration (license plate) number.[1] Id. The witness further stated that she only remembered the vehicle's information because the unknown male "had run to the vehicle and was trying to start it in a hurry." Id. After running the vehicle's registration number through dispatch, the vehicle belonged to Vanetta Smith of Fairmont (Joint Ex. 1 at 3, 6, 7).

Officers Carder and Golden located the vehicle, unoccupied at the moment, illegally parked at 618 Market Street in Fairmont (Joint Ex. 1 at 6, 7). Officer Golden then issued the vehicle a citation for parking left of curb and placed the citation under the vehicle's windshield wiper (Joint Ex. 1 at 7). Later, at approximately 12:45am, Officer Carder returned to Market Street and noticed the vehicle was no longer parked there (Joint Ex. 1 at 6). He then notified Officers Hall and Golden that the vehicle was mobile. Id.

### B. Traffic Stop and Subsequent Pursuits

As Officer Hall was driving on a traffic-less Cleveland Ave heading towards Adams Street, he noticed a maroon Chevy Cavalier with an African-American driver pass by him (Joint Ex. 1 at 3). Officer Hall then pulled behind the vehicle and saw it matched the registration number of the vehicle that was previously parked illegally on Market Street. Id. Watching the

---

[1] The vehicle was described as a maroon Chevy Cavalier with West Virginia registration number 2KN869 (Joint Ex. 1 at 3).

vehicle change lanes in the Madison Street intersection without using a turn signal, Officer Hall thereby conducted a traffic stop at the corner of Quincy and Adams Street. Id. The driver of the vehicle was a short-haired, tattooed African-American male wearing a white tank top. Id. When asked for identification, the driver handed Officer Hall the parking citation previously issued by Officer Golden. Id. The driver also verbally provided his name as Antonio Cottingham—the Defendant—and his date of birth, which Officer Hall ran through dispatch. Id. At this time, both Officers Carder and Golden had arrived at the traffic stop (Joint Ex. 1 at 3, 6, 7). However, at the scene, Officer Hall did not directly speak to either officer regarding the driver's identity assuming they had already learned the pertinent information from dispatch (Doc. No. 30, Hall Test.).

As the officers were standing behind Defendant's vehicle, Defendant suddenly drove away from the traffic stop down Ogden Avenue, a residential neighborhood with a reported speed limit of 25mph (Joint Ex. 1 at 3, 6, 7). The other officers then initiated a pursuit of Defendant. Id. Reaching speeds over 70mph, Officers Hall and Golden followed Defendant down Ogden Avenue (Joint Ex. 1 at 4, 7). Officer Carder took a different route down Maple Avenue (Joint Ex. 1 at 6). Turning onto Baltimore Street, Defendant stopped his vehicle and fled on foot (Joint Ex. 1 at 4, 6, 7). Because Defendant had fled into a thick brush, officers were unable to locate him. Id. The vehicle was later towed and impounded.[2] Id.

### C. Arrest

At approximately 2:54am, Officer Carder, who has had previous interactions with Defendant, spotted an African-American male wearing a tank top matching Defendant's

---

[2] Officers went to speak to Vanetta Smith, the vehicle's registered owner, who informed them that she knew Defendant personally because he may have been dating her daughter at the time (Joint Ex. 1 at 4, 7).

description running[3] across the Mid-City Bridge (Joint Ex. 1 at 6). Officer Carder then informed Officer Golden of his location (Joint Ex. 1 at 7). Officer Carder pursued the individual but was unable to apprehend him (Joint Ex. 1 at 6).

Officer Golden soon afterwards saw an African-American male, matching the description Officer Carder provided, running across Fairmont Avenue (Joint Ex. 1 at 7). When the male ran into an alleyway, Officer Golden initiated a foot pursuit issuing verbal commands to the person to stop (Doc. No. 30, Golden Test.). As Officer Golden was closing in, getting within 5–8 feet as he testified, the African-American male started to turn around and attempted to aim a silver handgun prompting Officer Golden, who could not unholster his firearm in time, to tackle him. Id. Officers Carder and Hall later arrived on the scene where they observed a silver Smith & Wesson revolver lying beside Defendant (Joint Ex. 1 at 4, 6). The weapon, Defendant's wallet, and two silver keys to the Chevy Cavalier were placed into an evidence bag and Defendant was taken into custody (Joint Ex. 1 at 5, 8). On November 3, 2015, the Grand Jury indicted Defendant with one count of "Felon in Possession of a Firearm" (Doc. No. 1).

## II. Defendant's Motion to Suppress

Defendant principally argues that the .44 caliber Smith & Wesson Revolver seized should be excluded because Officer Carder and Officer Golden had nothing more than "an undeveloped and unparticularized suspicion that [Defendant] was on the verge of violating the law at the time he ran across the bridge and through the streets of Fairmont" (Doc. No. 23 at 4). Specifically, Defendant alleges that Officer Carder had nothing more than a "hunch" that Defendant was engaged in criminal activity when he witnessed him running across the Fairmont Bridge. Id. at 3–4. Similarly, Defendant asserts Officer Golden did not have reasonable suspicion to suspect

---

[3] Officer Carder testified that the male running across the bridge was holding his right hand across his thigh to seemingly hold something in place; he did not, however, put this fact into his report (Doc. No. 30, Carder Test.).

Defendant of criminal activity either because his "decision to respond to the area and pursue [Defendant] was unsupported by reasonable, articulable facts. He was simply joining in on what was already an unwarranted pursuit and attempt to stop [Defendant]." Id. at 4.

### III. Government's Response to Defendant's Motion

The Government, on the other hand, argues that the evidence seized should not be excluded because reasonable suspicion did exist. Under the "totality of the circumstances" standard, "by the time that Officer Carder spotted the defendant running across a bridge on Fairmont Avenue, there was reason to believe that this defendant, who had already engaged in several manifestations of 'headlong flight,' was engaged in some sort of criminal activity." (Doc. No. 27 at 3–4). In addition, the Government highlights that the officers "had *actually observed* this defendant commit criminal violations, and those observations provided not only ample reasonable suspicion for a Terry stop, but also probable cause for an arrest." Id. at 4.

### IV. Discussion

The Fourth Amendment provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. Amend. IV. Warrantless seizures are "per se unreasonable under the Fourth Amendment[,] subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

### A. Reasonable Suspicion Standard

Nonetheless, an officer may stop and briefly detain a suspect for investigative purposes (known as a *Terry* stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 21 (1968). Whether there is reasonable suspicion depends on the totality of the

circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266, 273–74 (2002); United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a commonsensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); see also Arvizu, 534 U.S. at 273. Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 544 (1985) (level of suspicion is less than the level for probable cause); INS v. Delgado, 466 U.S. 210, 217 (1984) (need only minimal level of justification to make the stop); United States v. Harris, 39 F.3d 1262 (4th Cir. 1994); United States v. Turner, 933 F.2d 240 (4th Cir. 1991). On the other hand, an officer's reliance on a "mere hunch," is not sufficient to establish reasonable suspicion. See Arvizu, 534 U.S. at 274; Sokolow, 490 U.S. at 7; Terry, 392 U.S. at 27.

**B. Reasonable Suspicion Existed When Defendant Fled Multiple Times from the Police**

During the suppression hearing, Defendant argued, in conjunction with the arguments present in his motion, the initial traffic stop was illegal because no traffic violation occurred when he did not use his turn signal at the Madison Street intersection.[4] Even assuming *arguendo*

---

[4] Defendant points to a West Virginia Supreme Court of Appeals case to support his assertion:
> A motorist who makes a turn at an intersection without first using a turn signal to notify others of the intent to make the turn does not violate the provisions of W. Va. Code, 17C–8–9 [1951], read in para materia with the provisions of W. Va. Code, 17C–8–8(a) [1999], where no other traffic may be affected by the movement of the motorist's vehicle.

Syl. Pt. 2, Clower v. W. Va. Dept. of Motor Vehicles, 678 S.E.2d 41, 42 (W. Va. 2009). The Court does want to note some distinguishable facts. Although the street was indeed empty, Defendant did not "turn" at an intersection like the suspect in Clower who was travelling westbound and turned northbound. See id. at 42. Instead, Defendant here merely switched lanes at the intersection still travelling the same direction (Joint Ex. 1 at 3).

that the traffic stop was illegal because no reasonable suspicion existed, Defendant's subsequent flights leading police on a pursuit that lasted for most of the early morning hours is enough to justify probable cause—let alone the "minimal" reasonable suspicion requirement—for his eventually stop, arrest and, hence, admission of the recovered Smith & Wesson revolver.

The judicially fashioned remedy for Fourth Amendment violations is the exclusion of the unlawfully seized evidence from a defendant's trial. See Hudson v. Michigan, 547 U.S. 586, 590–91 (2006); see also Mapp v. Ohio, 367 U.S. 643, 655 (1961). To increase the deterrent effect of the exclusionary rule, evidence subsequently "obtained as a direct result of an unconstitutional search or seizure" is excluded from trial as "fruit of the poisonous tree." Segura v. United States, 468 U.S. 796, 804 (1984) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). Of course, evidence obtained by law enforcement officers after a Fourth Amendment violation has occurred is not excludable as fruit of the poisonous tree if the evidence had not been obtained "by exploitation of that illegality[,but] instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963).

Thus, where there is sufficient attenuation between the unlawful search and the acquisition of evidence, the "taint" of that unlawful search is purged. To determine whether the derivative evidence has been purged of the taint of the unlawful search, several factors are considered including: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) *the presence of intervening circumstances*; and (3) the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603–04 (1975) (emphasis added).

Defendant's intervening actions here consequently purged the "taint" of the allegedly illegal traffic stop. According to the Fourth Circuit, "[i]f a suspect's response to an illegal stop 'is

itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime.'" United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997) (quoting United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982)). Therefore, it naturally follows that "[b]ecause the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible." Sprinkle, 106 F.3d at 619. Agreeing with its sister circuit, the Fourth Circuit reasoned that a rule contrary to this principle would undoubtedly "virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." Id. (quoting Bailey, 691 F.2d at 1017).

The facts and rule from Sprinkle are analogous to the case here. In Sprinkle, the defendant, as he fled police officers following a traffic stop, pulled a weapon and fired at the officers pursuing him. Id. at 616. Eventually, the officers caught up to the defendant where he was detained and indicted for felon in possession of a handgun. Id. at 617. The Fourth Circuit held that no reasonable suspicion existed for the traffic stop; yet, however, the weapon was still admissible because the defendant fled and fired at police officers, which constitutes an illegal offense. Id. at 619–620.

Here, Defendant fled from Officers Hall, Carder, and Golden on four separate occasions: (1) fleeing the traffic stop in his vehicle; (2) abandoning his vehicle and fleeing on foot; (3) fleeing Officer Carder; and finally (4) fleeing Officer Golden in the alleyway (Joint Ex. 1 at 3, 6, 7). When Officer Golden eventually caught up to Defendant, verbal commands to stop were ignored (Doc. No. 30, Golden Test.). Thus, the undersigned finds that Defendant's new crimes of reckless driving and fleeing from police constitute "new" and "distinct" offenses. See W. Va. Code § 17C-5-3(a); W. Va. Code § 61-5-17. Because the .44 caliber Smith & Wesson revolver was recovered *after* Defendant committed the new criminal offenses, the causal chain between

the allegedly illegal stop and discovery of the weapon was broken. See United States v. Gaines, 668 F.3d 170, 174–75 (4th Cir. 2012) (holding that causal chain was not broken in this case though because the illegal evidence was discovered prior to the subsequent criminal activity).[5]

## V. Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's "Motion to Suppress" [Doc. No. 23] be hereby **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Date: January 8, 2016

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

---

[5] In Gaines, as police officers conducted an illegal pat down of the defendant, the defendant pulled a firearm from his waistband and assaulted one of the officers, who had felt the weapon's presence beforehand. Gaines, 668 F.3d at 171. The Fourth Circuit held that because the illegal firearm was discovered *before* the defendant assaulted the officer, the causal chain between the illegal stop and subsequent criminal conduct remained intact, which rendered the weapon inadmissible. Id. at 174.

# Attachment #1: Timeline of Events

- 8/23/15 12:04AM: Fairmont PD dispatched to respond to a call about a suspicious male

- Officer **HALL** arrived on scene and was told by a female witness that the Suspect had gotten into a maroon Chevy Cavalier and drove off

- Officer **CARDER** located the vehicle on Market Street

- Officer **GOLDEN** issued a citation because it was illegally parked

- At 12:45AM, Officer **CARDER** advised that the vehicle was no longer on Market Street

- Officer **HALL** saw the vehicle change lanes without signaling at the Madison Street intersection, which led him to conduct traffic stop

- Suspect provided the parking citation, his name, and date of birth to Officer **HALL**

- Suspect later took off in the vehicle from the traffic stop

- Officer **HALL, CARDER,** and **GOLDEN** pursued the vehicle

- Defendant reached speeds over 70mph during the chase on Ogden Avenue

- Defendant exited the vehicle and disappeared into the brush evading both Officers **CARDER** and **GOLDEN**; vehicle was later impounded

- 2:54AM Officer **CARDER** spotted Suspect running along a bridge

- Suspect continued to evade police

- Officer **GOLDEN** arrived on scene to assist and saw Suspect running on Fairmont Ave

- As Officer **GOLDEN** pursued Suspect, Suspect tried to draw a silver handgun

- Officer **GOLDEN** thereafter tackled Suspect, knocked gun away, and apprehended Suspect